The issue presented on this appeal is whether a spinal products company misrepresented the success of an acquisition when it failed to disclose that it had acquired defective and and that its inability to sell that product was reasonably likely to materially affect its financial performance. How do we know that? I looked in vain in the record to try to determine what the total amount of the inventory was versus the company's sales, and I couldn't make Heidner hair to link those two. I'm sorry, Your Honor. That's all right. The way that we know this is because Scientix had been a private corporation, Alphatec had been public. In December 2009, Alphatec said we're going to acquire Scientix and we're going to do it to achieve 20 percent revenue growth over time based on the cross-selling opportunities. Well, cross-selling opportunities, but that could mean that Alphatec was looking to Scientix's customer base as a broader market to sell its products. And maybe I didn't make my question very clear, but what I'm trying to figure out is what's the total percentage of products that Alphatec makes versus the total of the products that Scientix would otherwise be distributing? Trying to figure out whether this fits into the matrix scenario where it was 72 percent of the revenue. Can you answer that question? Your Honor, you're correct. It is not detailed in that sort of specificity. What we have detailed is that $8.2 million of defective inventory was written down at cost, that in terms of revenue it would have been even more than that to the company. But on a total inventory of the combined companies of what? I mean, $8.2 million may be nothing if it's a billion-dollar inventory. So the reason why that amount is material and is significant is because the company was touting $5 million worth of revenue synergies that it would save. Counsel, that's apples and oranges. The question here is valuation of the inventory, not total sales revenue to the company. And inventory and sales revenue are two different numbers. Yes, Your Honor, but if you look at item 303 of Regulation SK, it creates an affirmative obligation for a company that is issuing a secondary offering or issuing an offering generally to disclose a known uncertainty. So, Counsel, Ms. Reiser, is the answer to my question, we don't know what the total valuation of the inventory was for the combined companies? That's correct. What we know is what they projected up initially. And we don't know what the total valuation was of AlphaTex inventory standing alone? That's correct as well. So how can we conclude that it is plausible that a failure to discuss $8.2 million worth of worthless inventory was, in fact, material to the operations of the combined entity? Your Honor, what we do know is that the company was saying it would achieve 20% growth to the tune of $220 million and that on August 5th when it wrote down its revenue guidance, it projected downward to $180 million. So if we're looking at in terms of a percentage. But how do we know that that came from the valuation of the inventory? That could very well have been because they just didn't make the level of sales that they projected that they would make. That's correct. And the allegation here is that the nexus is that they said that they were going to have growth driven by the inclusion of Scientix revenue. That was what they touted. Instead, we know that there was a known uncertainty. They sent Richard Reyes out and on the week of March 12th, he sent pictures back saying this product is not worthwhile. What I really struggle with, Counsel, is that, you know, the allegations and the complaints have to have the level of specificity that meets the heightened pleading standards. So, you know, these types of cases are really in the detail of the allegations that are set forth in the complaint. And as I went over the synergy statement, the revenue growth statement, the consolidation statements, it's hard to fault the district court's logic with regard to the plain textual reading of those statements and where the misrepresentations really came out of that statement. So let's talk, for example, about the revenue growth statement. What allegation in the revenue growth statement do you think is false or misleading to meet the heightened pleading standard that's required? Your Honor, I would have two responses to that. The first response is with respect to your question directly, that when you talk about anticipating revenue growth that's 20 percent and it's driven by the inclusion of revenue from a company where you know you have acquired products that is highly unlikely to be able to be sold, then that makes it materially misleading not to also disclose the portion that has concern to you. So in the Omnicare case, for example. What I'm looking at here, we anticipate our revenues throughout the balance of 2010 will continue to grow, driven by cross-selling opportunities. So the nature of the two companies was such that there would be cross-selling opportunities. I don't think that that can really be disputed. They were in the same industry, essentially. So what about the cross-selling opportunities contributing to expect that revenue growth is false? What about it is false is knowing that you have inventory that can't be sold. And additionally, to look at it. But every company has problems with inventory. I mean, the problem in the medical field is akin to the problem in the aviation industry. You have to have pedigree for these parts. Basically, all the paperwork and documentation that shows that they were manufactured according to manufacturer's specifications. And as I understand it, there were two pallets of boxes of documents that came from scientists which arrived along about the same time as the inventory did. And the question was not necessarily that all of the inventory was rusted. The question was whether or not some of it was rusted, but some of it was untraceable, which would prohibit any company from selling it under the FDA regulations. Have I got that right? That's correct. And that 70% of it was ultimately written down, is what we've alleged. But again, I would focus first and foremost on what Regulation SK says about inducing people to invest in your company. It creates an affirmative obligation. And this is what the NVIDIA case just explained. There's an affirmative obligation to state facts in a registration statement to adequately inform investors. And if you look at the standard that the SEC set forth, the standard is one in which if there is an uncertainty about whether or not you can sell that product and you can't value it before you issue the documents, you still have an obligation to speak up about that uncertainty unless you are sure it won't have a material impact. But what if you're still investigating the inventory to try to determine whether all or a portion of the inventory is sellable? As I read the record, it looked like that Scientex was sloppy in its record keeping and that one of the problems that Alpha Tech had, which is why people kept making periodic visits to the warehouse, to look at these two pallets of records was to try and figure out, well, how bad is the traceability problem on these parts? And, you know, there may be some portion of them that we can piece the paperwork together and now we can sell the stuff. But your allegations in the complaint don't give us any help in determining what did the company know and when did it know it. And the parts started arriving very close in time to the disclosures that you claim were material due to omissions. So, Your Honor, I would point you to the week of March 12th when Mr. Reyes was sent out by Alpha Tech. He sent back pictures. He had a vice president of operations who was on a conference call with two senior directors and he said, we have a problem. Two weeks later, on March 29th, again, several weeks before the offering, he got on the phone with Defendant Kuyper as well and said, this product is not worth sending back. When we look at the 19... But they ended up being sent back anyway? That's correct. It seems like factually the way that the complaint is alleged is that there was this guy who got sent out there to assess the inventory. He was reporting some problems back and said, well, you don't want to send this back. There are problems with this inventory. But Alpha Tech then sent it back to their warehouse in April anyway and continue assessing and investigating the inventory to see how much of it is in saleable condition. Is that a fair statement? I think that is fair and I think it's why the SEC guidance is so important because it says if management is unable to determine that a material effect is not reasonably likely to occur, then it must disclose the effects of the known trend, development, or uncertainty quantified to the extent reasonably practicable. So it's not... It is an affirmative obligation to speak and in the event that you're uncertain, it is an affirmative obligation to say what you know and to identify the factors. So is the scenario, the timeline, as you understand it, from March to August? That's correct. Okay. So at what point during that time period would you contend that management was in possession of sufficient facts that this trend or known uncertainty should have been revealed? In mid-March when Mr. Gray... I would say March 12th when the Vice President of Operations, who was in charge of the integration, found out was the first indication to the company that there was an uncertainty that it should be disclosing. March 29th when Defendant Kuyper was on the telephone or that week. I don't want to make it sound like a particular date. That was the second time where that company had knowledge. And then when the product arrived, it went immediately into a quarantine warehouse. A quarantine warehouse by definition means it's not on the shelves and it's not yet being sold. So I am clearly advocating for a disclosure standard that if you know you have material that is uncertain and that that can materially impact revenue. And again, Regulation SK has a broader standard for materiality. But part of the problem when you merge and acquire another company is that there's going to be a time period during which a consolidation of operations must occur. You're not taking the position, are you, as a matter of law that at the very beginning of the merger and acquisition process the company has to disclose things that it doesn't find out about until later during the process, are you? I'm not. And I think we should really distinguish between a 10b-5 claim and a Section 11 claim here. This is a company that was using a secondary offering to induce investment in the first instance. I believe that's why the standard is broader for what one must disclose. And so there is this affirmative obligation. And NVIDIA talks about why Section 11 is different. We believe it's different as well. And I think the company here we have pled plausibly was aware of these problems as early as the week of March 12th, so over a month beforehand. And all they had to say was we have acquired some inventory or a substantial amount of inventory that is defective or in quarantine. We are uncertain about the ability to sell it. And if we are unable to sell the inventory, it may materially impact revenue. So to get back to my earlier group of questions, let's suppose that there was a small amount of inventory that was quarantined as opposed to all of the material that came from the East Coast. Would it be your position that that would still have to be disclosed? No, Your Honor, and it's a good question. There is some point at which the management needs to make the determination that they have a problem that's not going to materially impact revenue. And they don't need to disclose that. It goes back to my question about the lack of knowledge as to what the valuation of this inventory is and how it relates to the sales of the combined entity. And I don't see anything in your complaint that addresses that. Your Honor, we would say that it's not that this is unknowable. The question is have we plausibly alleged enough that discovery would yield those numbers. I agree that we are proving it. That's what's missing are those two key pieces of information. What is the valuation of this inventory, and how does it compare to the valuation of the combined inventory and its effect on the sales of the combined company? When one looks at the valuation of the inventory relative to the impact on the combined sales, that is much closer to the basic test of materiality, which the NVIDIA decision explains is not the standard for Regulation SK. And that's why I keep coming back to Regulation SK and this affirmative obligation to speak. I see my time is running down so I can just finish this. So it's an affirmative obligation to speak when there's a known uncertainty and to give investors who you are soliciting to invest the opportunity to understand why results may differ down the road. And that's the obligation that we think was violated in violation of Section 11 here. Thank you. Thank you. Good morning, Your Honors. Peter Wald on behalf of the appellees. I will focus my remarks on Item 303 of Regulation SK because that's what Ms. Reiser addressed. Let me make a couple of threshold points. As the panel undoubtedly knows, Item 303 of Regulation SK applies to the registration statement and the prospectus statements. It does not apply to any other statements. So the relevant time frame, Judge Tallman, when you asked, is not March to August. The relevant time frame is from the last week in March to the first week in April when Mr. Kuiper was on this telephone call until April 16th, which is the date of the alleged misstatements in the prospectus and the registration statement. A breathtakingly short period indeed. So prior to the issuance of the prospectus in mid-April of 2010, there were already multiple indications that there were serious problems with inventory. So as I look at the revenue growth statement, I think that, as Judge Tallman points out, during mergers and acquisitions, there are going to be anticipated problems. And if the statements are general, such as, well, we expect that there's a synergistic relationship because of the similarity in products, we expect cross-selling opportunities, we expect to have access to markets that we otherwise wouldn't have, all that is fine. But what about the representation that the revenue will continue to grow at a time when you know you're not going to be able to immediately sell the inventory because you're being told that the inventory that's being examined in East Coast are so worthless, it's not even worth sending back to headquarters. All right. So let me take that on, Judge Winn. Let's talk about the allegations that are in the complaint. The allegations that are in the complaint is that Mr. Reyes, who is something like three levels below the vice president in charge of operations, and he's the only one who's alleged to have any detailed view of this, went to the East Coast facility of Scientix and reviewed some inventory. The allegations of the complaint are completely opaque as to what inventory he reviewed. And as the district court pointed out in language that they quoted from the complaint, it simply says that of the inventory he saw, so we don't even know what portion of the inventory that was in the East Coast warehouse was really fit the description that Mr. Reyes gave it of being missing documentation or being broken. That's the first point. The second point is that Scientix was a French company. And if you take a look at ER 66, the plaintiffs lay out the square footage of the Westchester, Pennsylvania warehouse. It's about 2,500 square feet. That compares to 21,900 square feet of warehouse facility in France, so roughly a tenth of the total overall inventory. So in terms of Judge Tallman's question, the only thing that we do know from the complaint is that Mr. Reyes went to a warehouse that is roughly one-tenth the size of their total warehouse facility, saw some inventory which is unspecified, and that with respect to the portion of that East Coast inventory that he saw, noted that much was missing documentation and was broken. That's as much as we know from this complaint, Your Honor. Now, that does not rise to the level of an Item 303 reportable uncertainty. In the April 16 prospectus, the company issued risk warnings, and those risk warnings talked about the potential that if the company was unable to integrate the two companies, that that could impact its revenue projections. So with respect to what was actually said about revenues, and you can take a look at the Oxford Asset Management case, which is the 11th Circuit, Your Honor, and they take this on, if the uncertainty that is alleged is nothing more than the general uncertainty that has already been disclosed, then that's not even a known uncertainty. That's the first part of the test. The second part of the test is it has to be known that it will have a material impact on the company's financial condition or results of operation. And how is it that on the basis of this complaint, which says virtually nothing about the amount of inventory or the role of that inventory in the revenue projections to which they assign error, nothing whatsoever in the complaint about those issues, how is it that that can be a known uncertainty that is known at the time to have a material impact on the company's results of operations? It doesn't come close to meeting the standard in Item 303. This is a matter of days. I would also point out, Your Honor, that as Your Honor pointed out when Ms. Reiser was speaking, the facts, as alleged, are that Mr. Reyes made his report. It was considered. This is, what, three days now into the process of integration? And the decision was made by the company, by the superiors, by the three levels above him, to bring the alleged defective inventory back to Carlsbad so that the company could actually review whether they could find the documentation, whether they could fix broken parts. This is all, as Judge Kleinfeld pointed out in the Ronconi case, this is the stuff of business. This is what businesses do. They work with issues, particularly in a merger, which has lots of messiness to it, typically with two big companies, and to argue that the company knew within the meeting of Item 303 four days after this alleged telephone conference that it had an uncertainty that had a reasonable likelihood of materially threatening its performance, I just think is to play fast and loose with the facts, Your Honor. Let me point something else out. There is a complete disconnect between the plaintiff's alleged Item 303 nondisclosure and their loss causation theory. Paragraph 94 encapsulates what they say the corrective disclosure is, what the truth, when the truth came to the market, this was the truth. And what was the truth? It doesn't say anything about product inventory. It talks about difficulty in integrating the companies, and a variety of other things that are mentioned, but there's no mention of the word inventory. Indeed, we searched the record, the entire ER, for statements about problems with the inventory connected to the August 5th, 2010, alleged corrective disclosure, and we could find none. Clearly, Mr. Piper did speak about the utility and the benefit to AlphaTec of getting access to Scientix products, and indeed, one of the things that he mentions is that they spend time, that one of the bumps in the road that they hit with integration was the difficulty of loading AlphaTec's SKUs into Scientix's platform. What are SKUs? I think it's called a stock-keeping unit, Your Honor. It's like a bar code that's used to identify physical inventory or, frankly, intangible issues as well, intangible products. So is it your position, I'm looking at paragraph 94 of ER 109 and 110 of the amended complaint, where they seem to be talking about sort of inventory tracking problems, like trying to get this information loaded into their computer? Exactly, and what's interesting about it from our point of view, Your Honor, is that you don't load information about inventory into your computer unless the inventory is saleable. It's the opposite of what the plaintiffs allege here. There's no doubt that in February of 2012, the company announced that there was going to be a write-off of $8.2 million of inventory. That occurred long after the August 5, 2010 corrective disclosure, and there's no indication in that disclosure that there were problems with inventory that were creating any issues in terms of the company's ability to realize on its projections. You mentioned that the problems really in paragraph 94 weren't really due to inventory. It's really a consolidation problem. So what about the consolidation statement where the, is it Kuiper, Cooper? Cooper, the CEO of Alpha Tech, told investors, as of April 30, the U.S. operations have been consolidated into Alpha Tech's spine, and we remain on track to realize at least $5 million in savings by eliminating redundancies. That's a pretty blanket, specific statement, so can you address that? Yes, I can, Your Honor. I think if one takes a look at Mr. Kuiper's several statements and the company's several statements, they consistently distinguish between consolidation and integration. Consolidation refers to the consolidation of Scientix's physical location into the Carlsbad operations, and we submit that's a fairly standard use in business of the word consolidation. Integration, of course, is a much longer process, and as is typical in mergers, and as I said before, it's messy. It's messy to put two companies together, particularly two international companies. Mr. Kuiper never said that integration was complete. That's, quite frankly and respectfully to my colleagues on the left, a fabrication. You will search in vain for any statement by Mr. Kuiper that he ever said that integration was complete. He said that he was pleased with the state of integration as of a certain point in time, but, Your Honor, they don't challenge that statement. That's not a statement that they claim was untrue. So, just for the record, in the major announcement cited in the SAC, Alphatext stated that it was moving rapidly with planning the integration and consolidation within the U.S. That's ER 102. In Mr. Kuiper's May 10 statement, he said he was, quote, pleased with the progress we have made with U.S. integration of Scientix into Alphatext's finance, ER 108, and went on to note that U.S. operations have been consolidated into Alphatext's finance, ER 108 and 109. And in the publicly filed third quarter May 10, 2010, form 10-Q, the company again distinguished between consolidation and integration. My point about all this is that none of that has anything to do with inventory problems. Mr. Kuiper never said that the integration was complete. He said the opposite, that it was in process and that he was pleased with it in a statement that they don't challenge. I'd also note that Ms. Reiser spent some time talking about the 20 percent revenue growth projection. I believe, as she noted, that was a statement from December of 2009. That's also not a statement that they challenge. What we find popping up in their appellate brief, particularly in the reply brief and now in oral argument, is reference to a number of statements that they don't actually challenge as being false. There are three alleged statements that are false. Those are in the record. The district court ruled on them. And, of course, the plaintiffs, the appellants, have waived any challenge to any other statements that's well known and well recognized by this Court. You know, but I would also say, as I just did, that their characterization of Mr. Kuiper as saying that integration was complete is just incorrect. Your Honor, unless the panel has any other questions about Item 303 and that disclosure obligation, I do think it's interesting that Ms. Reiser addressed all of her comments to that and not to Section 11 or Section 10. I think she recognizes implicitly in doing so that this Court's jurisprudence on omissions rejects the very standard that the plaintiffs have advanced, which is a full disclosure standard. Brody makes very clear that that's not the law of this circuit. Riegel makes very clear that that's not the law of this circuit. And the Supreme Court in Omnicare just recently reaffirmed that Section 11 is not a full disclosure statute. And so I suggest to the panel that Ms. Reiser's focus on Item 303 is tantamount to an acknowledgement that if she can't shoehorn the claim in under Item 303, she has no claim. I would note, furthermore, to the extent that it becomes relevant or that it's relevant to the panel's thinking, with respect to Sienner on the May 10th statement, that's a very strong bar indeed, as the panel is well aware. NVIDIA recognizes that this Court's decision in Silicon Graphics remains the law of this circuit and that Silicon Graphics imposes an extremely high pleading bar with respect to an omissions case in particular. The bar that it says is not mere negligence, not even gross negligence, but an extreme departure from the standard of care. And the plaintiffs would have this Court leap from whatever it is that one takes from Mr. Reiser's allegations four days before the product is first shipped, would have this Court leap to a finding that the defendants acted in a manner that reflects an extreme departure from ordinary care. And we respectfully submit, Your Honors, that they can't get there. Thank you. Thank you. Good morning again. I wanted to quickly address the idea that I have, in fact, spoken about Regulation SK and Item 303, which, if violated, is a violation of Section 11. So I don't want to leave the panel with the misunderstanding that I have abandoned Section 11 claims altogether. But we are going to rely on our papers on some arguments that I will not have time to get to. The important thing to me about Regulation SK, in primary part, defendants have argued that it doesn't apply to an S3 form, and I think it would really be a mistake of law to let that be the case. Form S3 is a way for companies to efficiently issue offerings. It allows them to incorporate by reference their 10-K forms, which includes a management discussion. So to the extent that somehow they don't have to update that with a known uncertainty would be allowing a company to issue a Form S3 and avoid liability under the securities laws, and that should not be the holding. If you look at the Silverstrand case that we cited in the First Circuit, it cites back to a Shaw case, also in the First Circuit, that has a very fulsome discussion of why Form S3 has the same disclosure obligations under Item 303 of Regulation SK. Secondly, I wanted to address Mr. Reyes in more detail to say that he's the person that Alpha Tech chose to send out, not once but twice, to assess the inventory. He came back with a report, and somehow the plaintiff is being asked to not treat that as a credible report or not one that they relied upon, even though he told the highest-level officials at the company, even though we have a confidential witness who tells us, this is senior buyer, that they discuss these issues constantly, and they include the Vice President of Operations Stott, and it includes CEO Kuiper. What's your response to the argument that the inventory in France was ten times the size of the U.S. inventory that you're complaining about? I understand and agree that there is inventory in Europe. That being said... And you're not making any allegations with regard to that inventory, are you? We are not making allegations with regard to that inventory. What we are saying is... For that, may I conclude that we are talking about less than ten percent of the combined inventory of the two companies? Your Honor... And I have no idea what Alpha Tech... We did not choose to make that conclusion in the complaint, and I'm not sure it's a fair conclusion to draw. I think the fair conclusion... It goes back to the theme of my questioning of you the last time you were standing here. How do you quantify materiality? And what I would say is Matrix says there shouldn't be a bright-line rule. So it's less than ten percent material? Typically, the benchmark is five percent of revenue. I think we've alleged that with respect to the 8.2 write-up. Was Alpha Tech a larger company than Scientix? Alpha Tech was a larger company, I believe, than Scientix. So you're getting dangerously close to below five percent, are you not? We don't believe that. We believe that the $8.2 million that was ultimately written off was in large part related to the inventory that Mr. Reyes saw. But you haven't alleged what the total value of the inventory is. We're back to the chicken and egg problem. I understand. I do understand. I believe that materiality is also qualitative. And the fact that the executives chose to discuss this constantly... Is it beyond materiality? I think it goes back to the fundamental question of whether there was false or misleading statements made. If you're receiving problems on a very small percentage of the inventory of the total company that you're trying to acquire, and you're optimistically saying that we're going to have this great synergy, have cross-selling opportunities, is that even a false statement in the first place? I think my time has expired. May I please answer your question? Go ahead and finish your answer. I understand what you're saying. If this was a chair sitting in a warehouse and it couldn't be sold, nobody would care. But they also wouldn't be discussing it constantly, and we wouldn't have a sales manager saying he was unable to sell the product, and we wouldn't have reports that 70% was written off and that no scientific inventory was sold during the class period. And those are the allegations that we use to support materiality. Thank you for your time. Thank you. Thank you. This matter is submitted. Thank you.
judges: Pregerson, Tallman, Nguyen